IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BEVERLY A. KNEPPER,

                Plaintiff,                         CV-04-1773-ST

      v.                                 OPINION AND ORDER

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

STEWART, Magistrate Judge:

## **INTRODUCTION**

      Plaintiff, Beverly A. Knepper ("Knepper"), brings this action pursuant to the Social

Security Act, 42 USC § 405(g) ("the Act"), to obtain judicial review of a final decision of the

Commissioner of the Social Security Administration ("Commissioner") denying her request for

disability insurance benefits ("DIB") and child's insurance benefits[1] under Title II of the Act, 42

USC §§ 401-34, based on chronic fatigue syndrome ("CFS"), fibromyalgia, and neurally

mediated hypotension.

---

[1] As discussed below, for unexplained reasons, the Commissioner has never ruled on Knepper's entitlement to child's insurance benefits since that application was denied on reconsideration.

All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c). For the reasons set forth below, the Commissioner's decision is reversed and this case is remanded back to the Commissioner for the calculation and payment of benefits.

## PROCEDURAL BACKGROUND

Knepper was born in mid-1961.[2] Knepper protectively filed an application for DIB on March 16, 1994, alleging disability since November 1, 1979, due to CFS, fibromyalgia, and neurally mediated hypotension. Tr. 100, 220-22, 249-56.[3] In order to be eligible for DIB, Knepper must establish disability prior to her date last insured on June 30, 1981. Tr. 101. Knepper concurrently filed an application for child's insurance benefits.[4] Tr. 139. To be eligible for child's insurance benefits, she must establish that she was disabled by age 22 in mid-1983.

Knepper's applications were denied initially on August 1, 1994, and on reconsideration on October 7, 1994. Tr. 234-37 (DIB initial), 241-43 (DIB reconsideration), 885-88 (child's insurance benefits initial), and 880-84 (child's insurance benefits reconsideration). On November 15, 1994, Knepper timely requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 244-45. Hearings were held before ALJ Joel T. Elliott on September 5, 1996, and November 13, 1996, at which Knepper, her parents, two of Knepper's treating doctors, and a vocational expert testified. Tr. 136-217.

---

[2] In accordance with Local Rule 10.3(a)(3), only the relevant year is given.

[3] Citations are to the page(s) indicated in the official transcript of record filed on April 7, 2005 (docket #8).

[4] Knepper's application for child's insurance benefits is one document of nearly 30 pages missing from the official transcript of record and "unavailable." Court Transcript Index (docket #8), note 1.

The ALJ issued a decision on December 27, 1996, finding Knepper ineligible for DIB. Tr. 97-110.[5] After the Appeals Council denied review, Knepper then filed a complaint in this court, which affirmed the ALJ's decision. On August 30, 2001, the Ninth Circuit reversed, and ordered this court to remand this case back to the Commissioner with instructions to properly assess Knepper's credibility, determine an onset date, and fully consider lay testimony, including that of Knepper and her mother, in determining the onset date. *Knepper v. Comm'r of Social Sec. Admin.*, 1999 WL 701834 (D Or, Sept 9, 1999), *reversed*, 2001 WL 1003071 (9th Cir, Aug 30, 2001).

On March 6, 2002, the ALJ conducted a supplemental hearing, at which Knepper and another vocational expert testified. Tr. 895-919.[6] On May 13, 2002, the ALJ issued a decision again denying DIB benefits. Tr. 733-48. The Appeals Council declined to assume jurisdiction. Tr. 701-04. Knepper now seeks judicial review of the Commissioner's May 13, 2002 decision.

///

///

///

---

[5] On November 17, 1994, just over a month after the reconsideration denials and two days after Knepper's request for review before an ALJ was received by the SSA, an SSA "Claims Representative" reportedly called the office of Knepper's attorney and asked whether Knepper was "filing [for a] hearing on her [child's insurance benefits] claims." Tr. 219. The Claims Representative's note to the file indicates that "They said no – just her DIB." *Id.* However, two years later, at the start of the September 5, 1996 hearing, Knepper's attorney clarified that Knepper was pursuing both types of benefits and that denials were on record for both. Tr. 139. Nevertheless, without explanation, the ALJ's December 27, 1996 decision addresses only the request for DIB, as do the subsequent decisions by this court and the Ninth Circuit. Tr. 100-10; *Knepper v. Comm'r of Social Sec. Admin.*, 1999 WL 701834 (D Or, Sept 9, 1999), *reversed*, 2001 WL 1003071 (9th Cir, Aug 30, 2001).

[6] At that subsequent hearing, Knepper's attorney denied that the Claims Representative had ever spoken to him, clarified that he "certainly would not say that" (referring to statement that Knepper's request for a hearing involved only the denial of DIB), and that he "would appeal everything there is to appeal." Tr. 898-99. The ALJ acknowledged that the record seemed to indicate that the Claims Representative had not spoken directly with Knepper's attorney: "[The Claims Representative's note says] attorney was contacted, and then it says 'they' said. So what 'they' is, is pretty generic." Tr. 899. Despite that conversation, the ALJ's May 13, 2002 decision again is silent on Knepper's application for child's insurance benefits and addresses only DIB. Tr. 733-48. Thus, since the time of the denials of reconsideration on October 7, 1994, the merits of the child's insurance benefits application has never been directly addressed by the Commissioner.

## STANDARDS

### I. Burden of Proof

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied* 517 US 1122 (1996). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months. . . ." 42 USC § 423(d)(1)(A). The Commissioner bears the burden of developing the record. *DeLorme v. Sullivan*, 924 F2d 841, 849 (9th Cir 1991).

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *see also Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995); *Pagter v. Massanari*, 250 F3d 1255, 1258 (9th Cir 2001). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews*, 53 F3d at 1039; *Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001). The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986). Moreover, "the court may not substitute its judgment for that of the Commissioner," *Edlund,* 253 F3d at 1156, and the Commissioner's decision must be upheld, even if "the evidence is susceptible to more than one rational interpretation." *Andrews*, 53 F3d at 1039-40.

///

## II.  Five Step Disability Evaluation Process

The Commissioner has established a five-step sequential process for determining whether a person is disabled.  *Bowen v. Yuckert*, 482 US 137, 140 (1987); 20 CFR § 404.1520.  In step one the Commissioner determines whether a claimant is engaged in "substantial gainful activity." The claimant is not disabled if he or she is able to engage in substantial gainful activity.  *Yuckert*, 482 US at 140; 20 CFR § 404.1520(b).

In step two the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments."  *Yuckert*, 482 US at 140-41.  An impairment is severe within the meaning of the Act if it significantly limits the claimant's physical or mental ability to do basic work activities.  20 CFR § 404.1520(c).  If the claimant is not severely impaired within the meaning of the Act, the claimant is not disabled.

In step three the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."  *Yuckert*, 482 US at 140-41; 20 CFR § 404.1520(d).  These are listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Listing of Impairments").  If the claimant's condition meets or equals a condition in the Listing of Impairments, the claimant is conclusively presumed to be disabled.  *Yuckert*, 482 US at 141.

In step four the Commissioner determines whether the claimant can perform work he or she has done in the past.  20 CFR § 404.1520(e).  To make this determination, the ALJ must assess the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite his or her limitations.  20 CFR § 404.1545(a); Social Security Ruling ("SSR") 96-8p.  If

the claimant can perform work he or she has performed in the past, then the claimant is not disabled.

In step five the Commissioner must use the RFC to determine if the claimant can perform other work that exists in the national economy. *Yuckert*, 482 US at 141-42; 20 CFR § 404.1520(e), (f). If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR § 404.1566.

At steps one through four, the burden of proof is on the claimant. *Tackett v. Apfel*, 180 F3d 1094, 1098 (9th Cir 1999). At step five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. *Id.*

## III. <u>Child's Insurance Benefits Analysis</u>

When individuals age 18 or over file a claim for child's insurance benefits, the disability rules applicable to adults are used; however, to be eligible for child's insurance benefits, the claimant must "at the time [the] application [is] filed" be "under a disability . . . which began before he [or she] attained the age of 22." 42 USC § 402(d)(1)(B)(ii); *see also* 20 CFR § 404.350(a)(5). Thus, in order to establish eligibility for child's insurance benefits, Knepper must demonstrate that she was disabled no later than mid-1983, when she reached 22 years of age.

///

///

///

///

///

**STATEMENT OF FACTS**

## I. Witness Testimony

### A. Childhood and High School

Just prior to her first birthday, Knepper fainted for no apparent reason. Tr. 185, 568. Her fainting spells quickly became a constant concern to Knepper's parents. Tr. 185-86, 568-70. Her fainting spells later were accompanied by "seizures" and a racing heart. Tr. 186, 570. Her mother carried her around as a small child and the fainting spells seemed to be less frequent. Tr. 568. Her parents enrolled Knepper in a cooperative kindergarten so that her mother could attend with Knepper. Tr. 186-87. During elementary school, Knepper fainted so frequently that her parents moved away from the busy street on which they were living for fear that she might faint when crossing the street and not have her older sister there to help her. Tr. 568. Her parents repeatedly took Knepper to see her doctor about the fainting spells. Although the doctor ruled out epilepsy, no other diagnosis could be made at that time. Tr. 187, 196. However, her pediatrician did note a drop in Knepper's blood pressure when she would stand up from a prone position, which he attempted to treat with various drugs and support stockings, to no avail. Tr. 196-97. By age 10, Knepper learned to avoid some of her fainting spells by modifying her activities, but the fainting spells were "always ready to appear with slight stimuli." Tr. 566-67, 570.

In her early childhood years, Knepper also experienced headaches and was fatigued to some extent. She missed the first grade due to severe headaches. Tr. 162. She had difficulty keeping up with other children and gravitated toward one friend who had rheumatic fever because that girl did not expect her to do a lot of physical activities. Tr. 160. When she tried to

do the physical activities other children would do, she would become lightheaded. Tr. 159.

Knepper believed in the importance of getting an education and made a concerted effort to do

well in school. Tr. 159-60. She disciplined herself to get up early enough to be sure not to miss

the bus, and though she would come home tired and want to rest, she would always do her

homework before going to bed. Tr. 188-89. She dropped out of extracurricular activities, saying

she was just too tired for them. Tr. 189.

Since childhood, Knepper has also suffered from Raynaud's syndrome, which causes her

fingers and toes to become very cold and hurt. Tr. 164-65. It is difficult for her to finger things

because her fingers become numb and very clumsy. Tr. 165.

During her last two years in high school, between 1977 and 1979, Knepper worked for

the Forestry Service in a photo developing laboratory. She worked about an hour and a half each

school day. Tr. 168, 690. She quit that job when she went to college in the fall of 1979.

**B. College**

Knepper's condition changed dramatically when she moved away from home to attend

Southern Oregon State College in the fall of 1979. At the start of fall term, Knepper enrolled in a

full-time schedule and obtained a job in the school cafeteria one day per week. Tr. 168, 690.

However, in November 1979, she became very ill and was "never the same," spiraling into an

onset of extreme fatigue. Tr. 160, 180, 298. In order to cope with her fatigue, she dropped out of

all activities, including those with friends and her cafeteria job. Tr. 180. The following

semester, Knepper moved into a private room so that she could sleep uninterrupted. Tr. 160,

180. She also took the easiest classes she could. *Id*. Knepper held on for one academic year

away from home, thinking that she would "get better if [she] could just get enough sleep."

Tr. 181.  But by that summer, she went back home "[and] just went to bed and didn't get up."
Tr. 203.

With "grim determination," Knepper spent the next ten years completing her college
degree.  In order to do so, she spent 16-20 hours per day sleeping, getting up to attend class in the
mornings, and again in the evenings to study.  Tr. 204, 287, 298.  She lost her ability to maintain
more than one college class per term.  Tr. 161, 686.  She often audited a class before taking it for
a grade, and sometimes audited a class more than once.  Tr. 161, 204.  In her sister's words,
Knepper "crashed" after her first year away at college, but persisted taking one class at a time
because she was "too beat to carry a full load."  Tr. 283.  Knepper's activities were restricted to
keeping herself physically clean and attending and studying for her classes.  Tr. 204-05.

In addition to the fatigue that plagued her, Knepper began experiencing migraine
headaches when she turned 18.  Tr. 162.  Those headaches would last 10-12 hours.  *Id.*  At age 19
(mid-1980), Knepper also began experiencing vision difficulties that were exacerbated by being
up.  Tr. 162-63.

Knepper's parents supported her physically, financially, and logistically during this
decade-long saga.  They helped pay for the private room for her at college.  Tr. 203.  When she
came home from college, her mother took over virtually all day-to-day household tasks such as
laundry, running errands, cooking meals, grocery shopping and the like.  Tr. 172.  When it was
apparent that Knepper was physically unable to carry her books to school, her parents let her
drive their car.  Tr. 204.  If she had too many books to carry, her parents carried them for her.  *Id*.
Knepper could not stand in line long enough to obtain a parking permit, so her parents stood in
line for her.  *Id*.

Knepper put on a tough front for the outside world, and when asked to be a teacher's aid, she declined because she knew she could not physically handle the job, but told people at school that she had to go home and take care of her aged mother.  Tr. 204.

## II.  Evidence of Medical Treatment

Between 1965 and 1975, Knepper was treated by Dr. Lendon H. Smith.  Dr. Smith observed Knepper's fainting spells, but was unable to determine their cause:

> She had passing out spells, that appeared to be some form of seizure disorder when she became stressed or excited.  She would stiffen out, hold her breath, and then collapse in a semiconscious sate for some minutes. . . . We tried medicines but nothing stopped them completely.  As she matured, she had them less frequently, but they were always ready to appear with slight stimuli.

Tr. 566; *see also* Tr. 683-84.

Dr. Smith also observed that Knepper was "unable to handle stressors of any sort: medications, shots, insect bites, temperature changes, infections whether viral or bacterial."  Tr. 567.

Between July 28, 1975, and December 30, 1987, Knepper regularly sought treatment from George Siegfried, D.C.  Tr. 628-29.  Those records indicate ongoing care – apparently chiropractic – from July 28, 1975, through January 30, 1976, and intermittently (four visits) between February 17, 1978 through April 6, 1979.  Tr. 628; *see also* Tr. 541-42 (referencing chiropractic care).

Many of Knepper's other medical records are no longer available due to the passage of time.  Tr. 686-87.  The available medical records reveal that by January 1981, Knepper returned to treatment with Dr. Siegfried, consulting with him four times between January 15 and March 27, 1981, apparently under the impression that her difficulties had a nutritional genesis and

believing him to have some expertise in that area. Tr. 628, 541 (chart note from later treating doctor stating that Knepper's ongoing difficulties with, among other things, "a lot of chronic fatigue [and] trouble concentrating . . . "led her to go to a chiropractor who 'specializes in nutrition.'").

After signing up for classes in the fall of 1981[7] at Portland Community College, Knepper opened a book and could not make out the words. Tr. 181. Because her parents were on vacation, she went to the emergency room at St. Vincent's Hospital. Tr. 181-82. At that visit, on September 30, 1981, Knepper was seen by Dr. Kimberly Griffin, complaining of being very tired and not feeling well for about two years. Tr. 556. Dr. Griffin diagnosed possible mononucleosis and referred her to Dr. John R. Lobitz, whom she saw two weeks later. Tr. 536-37. At that appointment on October 12, 1981, Dr. Lobitz noted "[m]ultiple seemingly-unrelated [symptoms], most severe of which is anorexia, fatigue, but without much objective findings, with the exception of some atypical lymphs that could suggest mononucleosis." Tr. 537. Knepper also reported "headaches, which apparently are severe at times." *Id*. At her follow-up appointment with Dr. Lobitz a week later, Knepper continued to report recurrent headaches and recurrent fatigue. Tr. 534. Dr. Lobitz found no "obvious cause" of her symptoms, and recommended a neurological consultation if the symptoms persisted. *Id*.

Dr. Lobitz was skeptical of Knepper's multiple symptoms and told her he thought she could continue taking a full load of college courses. Tr. 299. Instead, Knepper withdrew from school and "went to sleep for about four months." *Id*. She was unable to walk, "crawled to the

---

[7] Although Knepper testified that this was in the fall of 1980, the medical records from St. Vincent's Hospital, where she sought treatment, indicate that it was the fall of 1981.

bathroom" and slept up to 20 hours per day.  *Id*.  By December 1981, Knepper's parents were sufficiently worried that they contacted St. Vincent's Physician Referral Service and "requested a doctor who could help her with diabetes, adrenal problems and thyroid problems."  Tr. 299, 541.

On December 13, 1982, Knepper was seen by Dr. George F. Donahower, M.D.  Tr. 541-42.  Dr. Donahower's notes reveal that Knepper complained of ongoing difficulties with "a lot of chronic fatigue" and "trouble concentrating."  Tr. 541.  She was apparently still not back in school, but was hoping to resume school some time soon.  *Id*.  Dr. Donahower thought that the "[c]hiropractic diagnoses of low thyroid and low adrenal [were] extremely unlikely," and noted that Knepper had "some situational stress and a history of some truly abnormal eating behavior with excessive weight loss and then excessive weight gain," but otherwise made no diagnosis pertaining to Knepper's "chronic fatigue" and "trouble concentrating."  Tr. 542.  Knepper describes that visit as a full check-up, for "everything – cancer in the head, all [her] organs, etc.," which revealed nothing and at which the doctor suggested antidepressants.  Tr. 299.  Knepper declined the antidepressants and "went back to sleep until next summer."  *Id*.

Following that examination, there is a significant gap in the written medical records.  The next available record reflects a series of appointments, approximately semi-annually with Dr. Siegfried between August 3, 1984[8] and the end of 1987.  Tr. 629.  On April 9, 1987, Knepper went to the Portland State University Student Health Service and was "insistent" that she be tested for Epstein-Barr virus antibodies, stating that she had experienced recurring illnesses for the past five years.  Tr. 558.  However, the test came back normal.  *Id*.  Following that visit, chart

---

[8] Although there is a chart note reflecting something on January 13, 1983, the notation is in brackets and appears to simply reflect a payment on Knepper's account.  Tr. 629 ("pmt").

notes from the Student Health Service reflect sporadic treatment for water in her ear, hearing difficulties, and removal of warts through February 6, 1991.  Tr. 557-58.

Although Knepper periodically sought out alternative treatments prior to 1993, many of those medical records are no longer available.  Tr. 182-83, 686-87.

In September 1993, Knepper began treating with Dr. Kip Kemple, a rheumatologist. Tr. 140, 795.  Dr. Kemple testified that Knepper suffers both from profound fatigue and a "rather complex" neuropsychological or neuropsychiatric disturbance in brain function, which gives her "a lot of trouble with several areas of cognitive function, [including] memory, concentration, information, [and] organization."  Tr. 141-42.  The disturbance in brain function is more pronounced, which causes Knepper's "intellectual level function . . . to be blurred out or not work well" when she is "under more demands or stress physical or otherwise."   Tr. 142.

Knepper also has a "cardiovascular reactivity" known as neurally mediated hypotension associated with her CFS.  Tr. 142-43.  On February 15, 1996, Knepper underwent a "tilt table" test, which Dr. Kemple noted "demonstrates a prominent abnormality in regulation of blood pressure and pulse in an upright position."  Tr. 586.  Knepper experienced a "drop from rapid pulse to a heart rate of 50 and a significant drop in blood pressure" and "lost consciousness temporarily" from being placed in an "80 degree upright position" for only 20 minutes, which Dr. Kemple indicated "documents a clear co-morbid diagnosis of neurally mediated hypotension" and which may have been responsible for some of her difficulties when she was younger. Tr. 143-44, 586, 588.  After the test, she was bedridden for about a week and a half and felt very ill for two or three weeks after that.  Tr. 166-67.

///

While Dr. Kemple stated that he "[didn't] pretend to understand her illness as a child," he also testified that it was "possible that she had this pattern of early mediated hypotension as a child," based on his review of her childhood medical records and his understanding that her education had been "dramatically" interrupted, but that she was able to get through her education. Tr. 143.

With regard to Knepper's fibromyalgia diagnosis, Dr. Kemple noted that Knepper met the the diagnostic criteria of having more than 11 out of 18 paired tender points, and that while she could do certain activities, her "life is disrupted for a period of days to weeks after she does those activities." Tr. 145. Due to her pain and tendency to pass out, her ability to walk and stand is "limited" and "unpredictable." *Id*. Dr. Kemple estimated that Knepper could stand no more than 30 minutes and that her ability to do so would be unpredictable. Tr. 146. If she were to do a "significant" amount of walking such as by going grocery shopping, she would pay a "heavy price" for that activity and Dr. Kemple had "every reason to believe [Knepper's] description that she could not get out of bed for several days again or not work as much as a week" thereafter. Tr. 146.

Just being up wears Knepper out. Knepper testified that she sleeps with her mattress on the floor so that if she has to get up to go to the bathroom, she can "roll out and crawl." Tr. 205. If Knepper spends more than a couple of hours performing physical or mental activities, she pays for it over the next few days by experiencing a sometimes days-long bout with vertigo and dry heaves. Tr. 166-67, 170-71, 176, 200, 763, 271, 295. After her first hearing before the ALJ, Knepper experienced vertigo on the way home, then became nauseous and got dry heaves. Tr. 200. She was lightheaded and unable to be up for about three days. *Id*.

### III. Vocational Experts' Testimony

Richard Keough ("Keough") testified as a vocational expert ("VE") at the November 13, 1996 hearing.  Keough classified Knepper's job as a photo lab finisher as a sedentary, unskilled job and her job as a cafeteria worker as a light duty, semi-skilled job.  Tr. 210.  At the March 6, 2002 hearing, VE Kay Hartgrave ("Hartgrave") testified that it did not appear that Knepper had engaged in any substantial gainful work during the relevant period as those jobs were performed fewer than 20 hours per week.  Tr. 912.

The ALJ asked Keough to consider an individual of similar age, education, and work experience as Knepper who was restricted to simple light work and who was precluded from working at heights or from moving on or about dangerous machinery.  Tr. 210.  Keough testified that such an individual could perform simple assembly jobs such as those as a hand packager and small parts assembler.  Tr. 210, 215-16.  When questioned by Knepper's attorney, Keough testified that those jobs would be precluded if the individual had to change clothes as often as three times per day, had daily headaches lasting for several hours, had problems with nausea two or three times per week that would cause vomiting two or three times per month, and could predictably work only once or twice per week for one to two hours.  Tr. 212-14.  Going back to the ALJ's original hypothetical and adding problems with stamina or fatigue resulting in a work pace at about 60% of a normal person, Keough testified that performing those same jobs would be difficult.  Tr. 214.

At the March 2002 hearing, the ALJ asked Hartgrave to consider an individual of similar age, education, and work experience as Knepper who had the ability to perform light work, including being capable of being on her feet between six and eight hours per day and lifting

between 10 and 20 pounds, but who was restricted from working at heights or on or about moving machinery and performing fast-paced work or work that was not low-stress. In response to that hypothetical, Hartgrave testified that the individual could perform jobs as a cafeteria worker, a table worker, and a fast food worker. Tr. 913-14, 917). The ALJ then asked whether there were jobs for the same individual, performed at the sedentary level, to which Hartgrave responded that the individual could perform jobs as a garment pricer and a tray setter. Tr. 914, 917).

The ALJ then added a restriction that the individual would need to have access to a restroom, to which Hartgrave responded that workers in those jobs could use the restroom "intermittently" but would not be "expected to be away from the job too long or disrupt the duties very long." Tr. 915. In addition there would be "low tolerance" for employees taking unscheduled breaks. Tr. 916. When asked by the ALJ how many absences were allowed for the types of jobs described, Hartgrave responded that two or more days per month could cause early probation or termination, and that a lot of employers were not that flexible and would terminate employees the first time they do not show up for work and call in at the last minute. Tr. 915.

Knepper's attorney asked Hartgrave to consider the ALJ's original hypthetical, but to add that the individual would faint up to twice per month, had stamina in the bottom 1% of the population, had pain at an 8-10 level on a scale of 0 to 10 rendering the individual minimally functional five to seven days per month, required up to four or five restroom breaks per day that might take as many as two to two and a half hours out of the day. Hartgrave testified that such an individual could not sustain even basic, unskilled competitive employment. Tr. 917-18.

///

**ALJ's DECISION**

In his March 13, 2002 decision, the ALJ found the testimony of both Knepper and her parents not fully credible. Tr. 742, 744-45, 747 (Finding No. 5). The ALJ also found that Knepper had not engaged in substantial gainful activity since the alleged onset date of November 1, 1979, and had a combination of severe impairments prior to 1981 consisting of allergies, a history of unstable vascular response and fatigue not otherwise specified, but that those impairments did not meet or equal a listed impairment. Tr. 747 (Finding Nos. 2, 3, & 4). The ALJ also determined that Knepper was not able to perform her past relevant work, but had the RFC to perform a significant range of light work. *Id* (Finding Nos. 7 & 11). Finally, using Medical-Vocational Rule 202.21, and after considering the testimony of the VEs, the ALJ concluded that there were a significant number of jobs in the national economy that Knepper could have performed, including jobs as a cafeteria worker, table packaging worker, fast-food worker, packer, and tray setter. *Id* (Finding No. 12). As a result, the ALJ concluded that Knepper was not entitled to a period of DIB.

**ANALYSIS**

Knepper contends the ALJ erred in: (1) rejecting her testimony; (2) rejecting her parents' testimony; (3) failing to determine the onset date of her disabling impairments; (4) failing to follow the requirements of SSR 96-8P when formulating her RFC; (5) applying the Medical-Vocational guidelines and finding her capable of "light" work; (6) giving inadequate hypothetical questions to the VE and departing from the Dictionary of Occupational Titles without explanation; and (7) failing to acknowledge the child's insurance benefits application with a last eligible date in the summer of 1983. Knepper asks that her testimony, and the testimony of her

parents, be credited as a matter of law, and that the Commissioner's decision be reversed and this action remanded for an award of benefits.

After an exhaustive review of the record in this case, this court concludes that the ALJ erred in discounting the testimony of Knepper and the lay witnesses who testified or submitted statements on her behalf, and that when that testimony is properly credited and considered along with the medical evidence, it fully supports Knepper's allegation of an onset date predating her date last insured.

I.  **Rejection of Testimony**

    A.  **Legal Standard**

In order to reject a claimant's complaints, the ALJ must provide "'specific, cogent reasons for the disbelief.'" *Lester v. Chater*, 81 F3d 821, 834 (9th Cir 1996), quoting *Rashad v. Sullivan*, 903 F2d 1229, 1231 (9th Cir 1990). Additionally, "[o]nce the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Id* at 824, citing *Bunnell v. Sullivan*, 947 F2d 341, 343 (9th Cir 1991) (*en banc*) and *Cotton v. Bowen*, 799 F2d 1403, 1407 (9th Cir 1986). Instead, if the claimant produces evidence of an underlying impairment which is reasonably likely to be the cause of the alleged symptoms and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of [the] symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996), citing *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993).

///

An ALJ's credibility determination is to be guided by a consideration of: (1) ordinary techniques of credibility evaluation such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. *Id* at 1284. General findings are insufficient. Instead, the ALJ must identify what testimony is not credible and what testimony undermines the claimant's complaints. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F3d 595, 599 (9th Cir 1999). However, provided the ALJ makes specific findings that are supported on the record, he "may discredit the claimant's allegations based on inconsistencies in the testimony or on relevant character evidence." *Bunnell,* 947 F2d at 346.

Similar limitations apply to an ALJ's rejection of lay witness testimony. The Ninth Circuit has clarified that "lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence . . . and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996) (citations omitted). Instead, an ALJ can reject lay witness testimony only "by giving specific reasons germane to each witness." *Regennitter v. Comm'r of the Soc. Sec. Admin.,* 166 F3d 1294, 1298 (9th Cir 1999), citing *Smolen*, 80 F3d at 1288.

///

///

///

///

///

B. **Analysis**

1. **Knepper**

The ALJ found Knepper's testimony "relating to the intensity of her pain and other limitations . . . unreliable and unpersuasive," opining that "[Knepper] and her family present herself as 'sickly' and of a disability status of very long or near life-long duration."  Tr. 744.  He apparently concluded that Knepper had a "tendency to exaggerate symptoms" (Tr. 745) based primarily on his observation that she had managed to attend college for ten years and earn a Bachelor of Arts degree in History with a "commendable" grade point average of 3.58.  Tr. 744.  He also discounted her testimony based on the lack of objective medical evidence to substantiate the degree of her subjective symptoms.

Whether to credit a claimant's subjective testimony first requires determining whether there is medical evidence of an underlying impairment and evidence of malingering.  The record in this case reflects diagnoses of CFS, fibromyalgia, and neurally mediated hypotension, albeit not prior to Knepper's date last insured.  However, it is the onset of Knepper's disabling symptoms, and not the timing of Knepper's diagnoses that is critical.  Moreover, despite the ALJ's apparent conclusion that Knepper deliberately presents herself as "sickly," the record contains no evidence of malingering.  To the contrary, Dr. Kemple testified that he had "every reason to think that there is a major limitation or impairment" (Tr. 153), and Dr. Smith echoed this view, blaming his "poor diagnostic abilities" for failing to recognize her neurally mediated hypotension earlier.  Tr. 683-84.  Therefore, the ALJ was required to give clear and convincing reasons for discrediting Knepper.

One reason given by the ALJ, namely a lack of objective medical evidence to substantiate

Knepper's testimony, is clearly insufficient. The Ninth Circuit has expressly rejected such an approach:

> Upon finding that Ms. Knepper had a severe impairment, the ALJ was required to make specific findings linking his credibility determination to the specific relevant evidence in the record. . . . [O]nce claimant establishes the existence of a medically ascertainable impairment, the ALJ cannot deny disability benefits solely because the degree of impairment is not supported by objective medical evidence.

*Knepper*, 2001 WL 1003071 at *1, citing *Bunnell v. Sullivan*, 947 F2d 341, 345-48 (9th Cir 1991)(*en banc*).

In addition, the ALJ noted that in 1987, Knepper and her parents "wanted her to have a virus titer for Epstein-Barr apparently because of recurring illnesses," but that the test results were normal. Tr. 744. The ALJ's clear implication is that Knepper and her parents were hypochondriacs who insisted on unnecessary medical tests but that the objective test results did not support Knepper's claimed symptoms – or any symptoms for that matter.

According to the ALJ, "[Knepper] reported feeling very well but insisted that the tests be done." *Id*. This is apparently a reference to a chart note that on that particular day, Knepper felt "very well." Tr. 558. However, that observation provides no basis on which to discount Knepper's testimony given that the same chart note states that Knepper wanted the test to determine whether Epstein-Barr was the source of her difficulties for the "past [five] years" *Id*. Moreover, the record reveals that: (1) Knepper had "good days" and "bad days" depending on her activities (Tr. 142, 146, 173-75, 178-79, 302, 603-619, 631-47, 672-83, 687, 903); (2) CFS and fibromyalgia were not generally well understood in the medical community in 1987 and were just gaining recognition in the 1990s; and (3) the primary diagnostic criteria for CFS is subjective

in nature, namely chronic fatigue. *See*, *e.g.* SSR 99-2p ("the hallmark of CFS is . . . persistent or relapsing chronic fatigue that is of new or definite onset . . ., cannot be explained by another physical or mental disorder, is not the result of ongoing exertion, is not substantially alleviated by rest, and results in substantial reduction in previous levels of occupational, educational, social, or personal activities"); *see also*, *Benecke v. Barnhart*, 379 F3d 587, 590 (9th Cir 2004) (noting that in 1990 the American College of Rheumatology issued a set of agreed-upon diagnostic criteria for fibromyalgia, but as of 2004 there were no laboratory tests to confirm the diagnosis); *Friedrich v. Intel Corp.*, 181 F3d 1105, 1112 (9th Cir 1999) (noting that, as of 1999, CFS was a "relatively new disease [with no] generally accepted 'dipstick' test").

Until she began treating with Dr. Kemple in September 1993, the record reveals that Knepper made unsuccessful attempts to obtain a definitive diagnosis of her conditions and tried a host of alternative treatments, including dietary restrictions (both as to content and timing), having her fillings removed, undergoing hair analysis, and testing for hormonal or thyroid problems. Tr. 182-83. The Commissioner's rulings recognize that the symptoms of CFS "may vary in incidence, duration, and severity" and that the "hallmark" of CFS is the presence of "persistent or relapsing chronic fatigue that is of new or definite onset . . ., cannot be explained by another physical or mental disorder, is not the result of ongoing exertion, is not substantially alleviated by rest, and results in substantial reduction in previous levels of occupational, educational, social, or personal activities." SSR 99-2p. Thus, the fact that Knepper may have been feeling "very well" during the brief period of time when she was at a doctor's office does not undermine her testimony that beginning in November 1979, she substantially reduced her

work, educational, social, and personal activities, and struggled simply to make it through one class a term for the next decade.

The Commissioner contends that there is an inconsistency between the statements of Knepper and her mother, pointing out that her mother testified that by the time Knepper reached high school, her fainting spells were rare.  Because the ALJ never cited this reason for disregarding testimony, it provides no basis on which to uphold his rejection of Knepper's testimony.  *See, e.g.*, *Connett v. Barnhart*, 340 F3d 871, 874 (9th Cir 2003) ("[w]e are constrained to review the reasons the ALJ asserts") (citations omitted); *Pinto v. Massanari*, 249 F3d 840, 847-48 (9th Cir 2001) ("if the Commissioner's contention invites this Court to affirm the denial of benefits on a ground not invoked by the Commissioner in denying benefits originally, then we must decline.").  Additionally, their testimony is not internally inconsistent.  Both Knepper and her mother, as well as several other lay witnesses, testified or submitted statements to the effect that Knepper's condition worsened significantly during the fall of her first year in college.  Thus, this provides no basis on which to reject Knepper's testimony.

What is also missing from the record to support rejection of Knepper's testimony is any indication that she has a reputation for lying, any prior inconsistent statements concerning her symptoms, and any testimony that appears less than candid.  As explained above, the record supports the opposite conclusion concerning these factors.  While the ALJ points to the long lapses in medical treatment, the record also reveals that Knepper and her family are of modest means and that Knepper had only minimal insurance coverage, which she eventually lost.  Tr. 157, 182-83, 286, 290, 688, 690, 904.  The record reveals the frustration and anxiety Knepper and her family experienced over her seemingly inexplicable problems, their frustration with

doctors who seemed not to believe her or think the problem had a primarily mental origin, and

their struggle to do what was necessary simply get Knepper through college – all in a quest to

insure that she would have job options in the future, a decision her mother now questions: "[W]e

. . . wanted her to get an education because we could see that she couldn't just be thrown out in

the world to get a job.  She had to have an education and I guess that was a mistake because that

wore her out."  Tr. 204.  Nor is there any evidence of failure to follow prescribed courses of

treatment or any evidence of daily activities inconsistent with Knepper's testimony.  In short, the

ALJ has not cited, nor does the record reveal, any reason sufficient to discredit Knepper's

testimony about the severity of her subjective symptoms.

### 2.  **Knepper's Parents**

The ALJ also discredited the testimony of Knepper's parents, noting that "[m]uch time

has passed since the reports/symptoms they observed in the claimant, as a child, prior to 1981"

and finding their testimony only partially credible "in light of the less than fully credible

testimony of the claimant and her tendency to exaggerate symptoms."  Tr. 745.  As just

explained, the record does not support discrediting Knepper's testimony.  Even if it had, it was

improper for the ALJ to discredit Knepper's parents on the ground that Knepper herself had been

discredited.  *Dodrill v. Shalala*, 12 F3d 915, 919 (9th Cir 1993).  As with Knepper, the record is

devoid of evidence that her parents have a reputation for lying, gave prior inconsistent statements

concerning Knepper's symptoms, or were otherwise less than candid.  If anything, the record

reflects a longstanding frustration with the inability to identify the source of Knepper's symptoms

and corresponding frustration with attempts at treatment which exacerbated her symptoms

(Tr. 592), combined with financial restraints on Knepper and her family which contributed to her

inability to aggressively pursue treatment. CFS was not recognized by as a disease until well after the expiration of Knepper's insured status, which left Knepper in a frustrating years-long quest to identify the cause of her difficulties. However, the lack of a definitive diagnosis does not undermine the existence of the symptoms or the credibility of the witnesses reporting those symptoms.

Furthermore, the record reveals that, other than her one academic year at Southern Oregon State University, Knepper lived with her parents. They were in the best position to observe the daily challenges she faced and their testimony must be fully considered.

### 3. Conclusion

In sum, nothing in the record – germane or otherwise – justifies rejecting the testimony of Knepper or her parents. Accordingly, their testimony concerning her symptoms must be credited. *Reddick v. Chater*, 157 F3d 715, 722 (9th Cir 1998); *Smolen*, 80 F3d at 1292 (9th Cir 1996); *Swenson v. Sullivan*, 876 F2d 683, 689 (9th Cir 1989).

## II. Effect of Crediting the Improperly Rejected Testimony

Knepper does not challenge the ALJ's findings at steps one through four of the sequential evaluation process. However, Knepper challenges the ALJ's failure to determine an onset date, the residual functional capacity analysis, and the step five determination. She also asserts that fully crediting the improperly rejected testimony leads inexorably to the conclusion that she was disabled prior to the expiration of her insured status for DIB.

///

///

///

A. **Onset Date**

Entitlement to DIB and child's insurance benefits turns, in part, on the onset date of the alleged disability.[9]  In this case, the Ninth Circuit found that in determining the onset date of Knepper's impairments, the ALJ improperly discredited Knepper's testimony concerning the degree of her impairments by effectively requiring objective medical evidence to support that testimony and by failing to fully consider lay testimony, including that of Knepper and her parents.  *Knepper*, 2001 WL 1003071 at *1.  Accordingly, the court directed the ALJ to properly determine the onset date of her impairment.  *Id*.  On remand, the ALJ again improperly discredited Knepper's testimony and that of her parents, and therefore never reached the issue of an onset date, instead concluding that Knepper was not disabled prior to the expiration of her insured status on June 30, 1981.  Tr. 741, 745-47.[10]

As discussed above, the ALJ provided no legally adequate reason to reject the testimony of Knepper and the other lay witnesses.  As a result, that testimony is fully credited and supports a significant change in Knepper's condition during the fall semester of her freshman year in college in 1979.  She and her family spent their limited resources struggling to identify the source of her symptoms, which by 1981 were sufficiently mysterious but limiting that Knepper confided to her mother that she thought she was going to die.  Tr. 287.

///

---

[9]  The onset date does not necessarily determine the date benefits are payable, which is limited by the date the application is filed.  In this case, the alleged onset date is November 1, 1979, but Knepper cannot recover past disability benefits for more than the twelve months preceding the month in which she applied for benefits.  20 CFR § 404.621(a).

[10]  Although the ALJ's final finding states that Knepper was "not under a 'disability' . . . at any time through the date of this decision," all other findings in the ALJ's decision refer to the time frame "prior to 1981."

On October 12, 1981, just four months after the expiration of her insured status and some 12 years before Knepper filed either of her two applications for benefits, she was seen by Dr. Lobitz, reporting a "year or two" history of feeling tired and "[m]ultiple seemingly-unrelated" symptoms, the "most severe of which is anorexia, fatigue, but without much objective findings, with the exception of some atypical lymphs that could suggest mononucleosis." Tr. 536-37. Dr. Lobitz found "no obvious cause" of her symptoms and Knepper testified that her condition has not improved since she went to see Dr. Lobitz. Tr. 181, 534. Dr. Lobitz's reference to a "year or two" history of difficulties fully supports Knepper's allegation of an onset date of disabling impairments in November 1979.

As observed by the Ninth Circuit, the medical expert consulted in this case (Dr. Kemple) was unable to determine an exact onset date. *Knepper*, 2001 WL 1003071 at *1. The difficulty in this case is that the diagnosis of Knepper's impairments came well after her date last insured for purposes of DIB and well after her 22nd birthday, which sets the date for establishing a claim for child's disability benefits. However, the testimony of Knepper and other lay witnesses as to her symptoms during the relevant time is consistent with the diagnoses later made by Dr. Kemper and fully supported by objective evidence. Although Dr. Kemper did not give an exact onset date, he testified about the prognosis for the population of patients with overlapping diagnoses for CFS and fibromyalgia ("they don't improve") and indicated that he was "assuming" that Knepper was in the category of patients with "childhood or adolescent onset chronic fatigue syndrome." Tr. 158-59.

Because of the lack of definitive expert testimony concerning an exact onset date, the Ninth Circuit instructed the ALJ to "fully consider lay testimony" in determining an onset date.

*Knepper*, 2001 WL 1003071 at *1, citing *Armstrong v. Comm'r of the Soc. Sec. Admin.*, 160 F3d 587, 580-91 (9th Cir 1998). When the improperly rejected testimony is properly credited, it points unwaveringly to the conclusion that the disabling effects of Knepper's combined impairments manifested in the fall of 1979, and have not abated since. Her fatigue – the primary diagnostic criterion for CFS – manifested in November 1979, and only by resolutely and methodically taking a minimal course load, eschewing outside activities, resting about 16-17 and sometimes as many as 20 hours per day, and having the constant support of her parents in performing all the mundane tasks of day-to-day life did Knepper manage to complete a degree over the course of a decade. Her work and educational history indicate that Knepper is no slacker. She placed a high value on obtaining her education and was willing to work while attending school in an effort to pay for that education until her body could no longer do what her mind instructed. Tr. 285.

Knepper and the ALJ have diametrically opposed views as to the nature of her college experience. Knepper typically took only one class per term, audited many classes before taking them for a grade, skipped entire terms to rest, and struggled mightily to simply meet the demands of that greatly reduced academic schedule. Her family supports this view, describing how Knepper "crashed" when she came home after the first year of college. Meanwhile, the ALJ noted that Knepper had managed to complete her degree with a commendable grade point average and sought very little medical treatment during that time frame. While the ALJ characterized Knepper's college experience in glowing terms, the testimony of Knepper and the lay witnesses reflects that Knepper was simply trying to get through a minimal course load and devoting all of her limited energies to achieving that goal.

SSR 83-20 dictates that in "determining the onset date of disability, the date alleged by the individual should be used if it is consistent with all the evidence available." Dr. Kemple found nothing unusual about Knepper's long stretches without significant medical care given her family's lack of financial resources and the "very typical story" of patients in her position with a "profound impairment in stamina and activity tolerance" stemming from a "complex" and "severe" combination of conditions that were, even as of the time of his testimony as yet ill-defined and not well understood in the medical community. Tr. 147-48, 156. Nevertheless, Dr. Kemple testified that Knepper's diagnoses are supported both by her descriptions of symptoms and by objective findings including tender points and a tilt-table test. While it was only in hindsight that Knepper was able to associate her long bout with debilitating symptoms with definitive medical diagnoses, the entire record supports the conclusion that the disabling effects of those diagnoses manifested in the fall of 1979. This court concludes that the ALJ erred by concluding otherwise.

**B. Residual Functional Capacity and Step Five Determination**

**1. RFC for "Light" Work**

Knepper argues that the ALJ's RFC assessment is contrary to SSR 96-8p, which requires the ALJ to undertake a "function-by-function" analysis of the claimant's capacity to work according to exertional categories. The RFC assessment "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light medium, heavy, and very heavy." SSR 96-8p.

Knepper argues that the ALJ erred when he determined that she had the RFC to perform a significant range of light work. In his decision, the ALJ found that Knepper's "ability to perform all or substantially all of the requirements of light work was impeded by additional exertional and/or non-exertional limitations." Tr. 746. The ALJ did not specify those additional limitations, other than to note that they may have caused her "some level of ongoing or periodic discomfort." Tr. 742. He described her RFC during the time frame prior to her date last insured as follows:

> [Knepper] was able to lift and carry more than 20 pounds occasionally or more than ten pounds on a regular basis and to stand or walk for more than a half-hour. She could not, however, due to her history of childhood fainting, work at heights or around moving or dangerous machinery. Also, she should not work at any job that was not simple and need[ed] low stress work and could not perform any work that was complex or fast paced. Furthermore, she could not perform any work which did not permit her access to [a] restroom.

Tr. 745.

As discussed above, the improperly credited testimony of Knepper and other lay witnesses paints an entirely different picture of Knepper's symptoms and abilities in late 1979 than found by the ALJ. Two aspects of that testimony are critical here and wholly undercut the ALJ's RFC findings. First, light work requires standing or walking for approximately six hours out of an eight hour work day. SSR 83-10. An RFC for this type of work would require a finding that the individual could sustain this type of activity on a "regular and continuing basis," meaning six hours out of an eight hour work day, five days per week. SSR 96-8p. As discussed above, as of late 1979, Knepper was unable to maintain her job in the college cafeteria and most of her college classes due to a sudden onset of debilitating symptoms of a later-diagnosed

combination of conditions.  Second, adding to her problems with chronic fatigue and a resultant need for rest, she suffers from neurally mediated hypotension, which causes a "prominent abnormality in regulation of blood pressure and pulse in an upright position."  Tr. 586.  This court need not belabor the merits of the ALJ's RFC analysis.  These combined conditions rule out light work.

### 2.  <u>Effect of RFC Analysis on Step Five Determination</u>

Because the RFC for light work is inappropriate given the properly credited testimony, the bulk of the jobs identified by both VEs are precluded.  Nevertheless, the Commissioner points to one sedentary job identified by the ALJ and asserts that identification of that job is sufficient to meet the Commissioner's burden of identifying other work that Knepper could have performed.  However, the tray setter position identified by the ALJ as DOT 318-687.014 also has a light exertional requirement, and the only sedentary job identified, a table worker (DOT 739-687.182), requires the ability to work examining materials passing by on a conveyor belt.  That work is precluded by Knepper's acknowledged vertigo which limits her to "low stress work" and precludes "fast paced" work.  Thus, the ALJ's step five finding is unsalvageable.

### 3.  <u>Remaining Issues Raised by Knepper</u>

In addition to arguing that the ALJ erred by failing to follow SSR 96-8P when formulating her RFC and by finding her capable of light work, Knepper argues that the ALJ erred in several other ways in steps four and five of the five-step analysis.  However, this court need not and does not address those remaining issues.

///

///

### III. **Additional Proceedings**

The decision whether to remand for further corrective proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir 2000), *cert denied*, 531 US 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate where no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision. *Rodriguez v. Bowen,* 876 F2d 759, 763 (9th Cir 1989).

In addition, evidence should be credited and an immediate award of benefits directed where "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Harman*, 211 F3d at 1178, quoting *Smolen*, 80 F3d at 1292.

As explained above, the ALJ provided insufficient reasons for discrediting the testimony of Knepper and her parents. By crediting that testimony, the record overwhelmingly supports the conclusion that Knepper was disabled by reason of medically determinable impairments before her date last insured (June 30, 1981). Because there are no outstanding issues that must be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find Knepper disabled if all improperly rejected evidence were credited. *Smolen*, 80 F3d at 1292.

This court rejects any suggestion that Knepper's claim for child's insurance benefits requires further proceedings. The evidence in the record supports a finding of disability prior to Knepper's date last insured for purposes of DIB in June 1981, which in turn mandates the conclusion that she was disabled within the time period for eligibility for child's insurance benefits in the summer of 1983. Nor is there any need to establish an exact onset date, given that Knepper's application for child's insurance benefits was not filed until well after her 23rd birthday. *See* SSR 83-20 (noting that child's insurance benefits cases do not require a precise onset date to be established and that such a finding is necessary only when (among other things), the application is filed before attainment of age 23).

Moreover, nothing in the record supports the conclusion that Knepper failed to aggressively pursue her claim for child's insurance benefits. To the contrary, the available evidence supports the opposite conclusion. At both hearings, Knepper's attorney clarified that there were concurrent applications for both DIB and child's insurance benefits. The ALJ appeared to agree that child's insurance benefits were under consideration (Tr. 138-40, 898-900), but without explanation failed to expressly rule on those benefits in his written decisions. The burden from that oversight should not fall on the claimant.

///

///

///

///

///

///

**ORDER**

For reasons stated above, the decision of the Commissioner is REVERSED and this case

is REMANDED to the Commissioner for the calculation and payment of DIB and child's

insurance benefits pursuant to sentence four of 42 USC § 405(g).

DATED this 24ᵗʰ day of January, 2006.

＿＿/s/ Janice M. Stewart ＿＿
Janice M. Stewart
United States Magistrate Judge